CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 12 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

BRIAN FARABEE,           )     **Civil Action No. 7:16-cv-00326**
     **Plaintiff,**       )
                       )
**v.**                     )     **<u>MEMORANDUM OPINION</u>**
                       )
**DR. ROBERT GARDELLA, <u>et al.</u>,**   )     **By:  Hon. Michael F. Urbanski**
     **Defendants.**     )          **Chief United States District Judge**

Brian Farabee, a Virginia inmate proceeding <u>pro se</u>, filed a verified amended complaint

pursuant to 42 U.S.C. §§ 1983 and 12101, <u>et seq.</u> Plaintiff names three defendants: Dr. Robert

Gardella, a staff psychiatrist at Western State Hospital; Dr. Christy McFarland, a staff

psychologist at Western State Hospital; and Daniel Herr, a Deputy Assistant Commissioner of

Behavioral Health Services for the Virginia Department of Behavioral Health and Development

Services ("Department of Behavioral Health"). Defendants filed a motion for summary

judgment, and Plaintiff responded, making this matter ripe for disposition.[1] After reviewing the

record, the court grants Defendants' motion for summary judgment as to the federal claims and

declines to exercise supplemental jurisdiction as to any state law claim.

### I.
### A.

The Circuit Court of the City of Williamsburg ("Circuit Court") adjudged Plaintiff Not

Guilty by Reason of Insanity ("NGRI") in 1999, and Plaintiff was civilly committed to the care

of the Department of Behavioral Health. As a result of a subsequent criminal conviction,

---

[1] Plaintiff's memorandum in opposition (ECF No. 47) includes, <u>inter alia</u>, exhibits 13 through 20 and references exhibits 1 through 12 filed at docket entry 36. Also, the court considers Plaintiff's affidavits to the extent they are made on personal knowledge, set out facts that would be admissible in evidence, and show that he is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Notably, Plaintiff cannot use his responses to the motion for summary judgment to present new claims not developed in the amended complaint. <u>Cloaninger v. McDevitt</u>, 555 F.3d 324, 336 (4th Cir. 2009).

    In addition to that memorandum, Plaintiff also filed a motion to correct the record (ECF No. 50), noting that he accidentally filed a document in this case meant for another case. Finding it appropriate to do so, the motion to correct the record is granted, the "supplemental memorandum" (ECF No. 48) is stricken from this docket, and the Clerk shall docket the "supplemental memorandum" in civil action 7:16-cv-00325.

Plaintiff was housed with the Virginia Department of Corrections ("VDOC") for several years. In the summer of 2012, the VDOC released Plaintiff back into the custody of the Department of Behavioral Health for continued commitment.

This lawsuit concerns the conditions of confinement Plaintiff experienced while civilly committed at Western State Hospital between September 10 and October 13, 2015.[2] Plaintiff asserts that Herr retaliated against him by transferring him from Central State Hospital to Western State Hospital where he was assigned to a more restrictive area called Ward 2-Elm. Plaintiff concludes that Herr, Dr. Gardella, and Dr. McFarland should be liable for the restrictive conditions he experienced in Ward 2-Elm. Plaintiff seeks injunctive relief to compel Herr to transfer him to Eastern State Hospital where he can be closer to family. Plaintiff also seeks damages.

### B.

Dr. Gardella and Dr. McFarland were assigned to Plaintiff's treatment team before he arrived at Western State Hospital. Dr. Gardella would be Plaintiff's physician and could prescribe medications and write orders for restraint, and Dr. McFarland would be his psychologist but did not have that authority.

On September 6, 2016, Dr. Gardella and Dr. McFarland received notice of Plaintiff's impending transfer and the most recent NGRI annual report filed with the Circuit Court. The report extensively reported Plaintiff's behaviors, including being aggressive, disrupting his and others' treatment sessions, refusing treatment, destroying state property, and smearing feces on walls. The report also noted that, ten days before being sent to Western State Hospital, Plaintiff

---

[2] Plaintiff left Western State Hospital on October 13, 2015.

had been on "a modified 1:1 status for monitoring of and possible prevention of self harm . . . . [and] violence observation status due to his aggressive behavior."

The report informed Dr. Gardella and Dr. McFarland of Plaintiff's extensive history of threatening and harming himself and others.

> [Farabee] has a history of self-inserting foreign objects into his rectum and urethra. Jail records indicate he had bronchitis, GERD, and a past positive PPD. He has also required various medical procedures for his self-injurious behaviors including surgery, suturing, endoscopy, and urologic procedures due to inserting foreign objects into his urethra. While at Marion Correctional Treatment Center he ingested a plastic spoon and required surgery to have it removed and had a subsequent colostomy. Prior to this transfer to CSH, he was assigned to the medical unit of the Powhatan Correction Center (however, he was housed in the more secure Mental Health Unit). He had a colostomy when he arrived at CSH – it was eventually reversed on 4/8/2013. He had a ventral hernia repair (due to his previous abdominal surgery) on 10/7/2013. Due to a fight . . ., he had a fracture of his right ring finger for which he had surgery on 4/14/2014. He was poorly compliant with post-op physical therapy. Also he has some other injuries on his left thumb due to physical aggression.
>
> * * *
>
> He has had numerous selfharm attempts various times throughout his hospitalizations as well as at DOC. The reason for his colostomy is that he had reportedly swallowed a spoon which became impacted and eventually he had to have surgery and subsequent colostomy due to this swallowing of the spoon.
>
> He had numerous diagnoses in the past including Dysthymic Disorder, Borderline Personality Disorder, Psychotic Disorder, Not Otherwise Specified, Bipolar Disorder, Schizophrenia and Major Depressive Disorder, Psychotic Features, Schizoaffective Disorder, Attention Deficit/ Hyperactivity Disorder, Conduct Disorder, Antisocial Personality Disorder, Not Otherwise Specified with Borderline antisocial Narcissistic Impulsive and Paranoid Traits, also Schizotypal Personality Disorder, Adjustment disorder, Delusional Disorder, Impulse Control Disorder and various other substance abuse disorders. In 1994 he was diagnosed by the ILPPP with Sexual Sadism.
>
> His behavioral symptoms included urinating in inappropriate places, smearing and eating feces, digging at his scabs, cutting, biting and burning himself, inserting items into rectum, drank bleach and swallowing non-food

3

items. He also is reported throwing urine and feces at others as well as hit, kick, scratch, spit and sexually assaulted others at various times through his hospitalizations.

Reportedly he continued these behaviors stated above at the DOC in order to be transferred to [Marion Correctional Treatment Center].

\* \* \*

Numerous [criminal] offenses noted[,] including burning or destroying a dwelling. He was found NGRI in 1999. He had malicious wounding charges in 2000 and found guilty and sentenced to 20 years with 16 years at Piedmont suspended. He also had assault and malicious wounding charges in 2000 as well. Most of these were nolle prossed. He had felonious assault [in] 2002 and he was found guilty and was sent to Correctional in 2004. There is reported numerous correctional infractions when in Red Onion Prison as well as Waller [sic] State Prison. He had numerous disciplinary infractions including self-injury, damaging property, smearing and throwing feces, spitting and throwing, threatening bodily harm, use of vulgar instant language and covering his windows with paper, and assault against staff and other inmates.

The report also specifically noted Plaintiff's propensity to be violent, use weapons, and hide contraband.

Mr. Farabee hit a staff member while an adolescent at CCCA with a flashlight. He has fashioned everyday objects into weapons to hurt himself including light bulbs, wall clocks, tin cans, staples, and paper clips. Previous reports indicate that he has reported a desire to obtain a firearm and engage in a mass shooting. While in the DOC he reportedly incurred criminal charges after he assaulted a peer with a lock in a sock. He also learned how to hide weapons on his person including his cheek tissues. While at Powhatan Correctional Center he was not allowed access to a standard writing utensil and was only allowed to use a "safety pen" under supervision, for fear he would have used it to harm himself or another person. Currently, his access to various items is restricted due to fears he would use them as weapons against others or against himself. While at CSH he has been found with contraband, e.g. pens, bottles, books, batteries, and other items which he should not have with him. He continues to attempt to get access to contraband items. He has not been seen or voiced thoughts of making items into weapons.

The report further described how Plaintiff refused to engage in meaningful discussions about his behavior or progress through the rehabilitative program called the "NGRI Graduated Release Process."

> [T]he Treatment Team . . . had attempted to meet with Mr. Farabee on a regular basis, but he continues to refuse to engage in treatment. He had refused to comply with ward rules on each ward he had been on and consistently files complaints if his needs are not met immediately. Mr. Farabee has not been able to maintain an aggression-free period for any significant length of time. Once he shows improved behavior, i.e. no aggression towards others, the Treatment Team would like to put a packet in for civil transfer to Eastern State Hospital.

## C.

Plaintiff arrived at Western State Hospital on September 10, 2015, and was assigned to Ward 2-Elm. Ward 2-Elm is an all-male admission unit at Western State Hospital, and it is considered a more restrictive ward with higher-risk patients found NGRI.[3] Ward 2-Elm rules require that a patient attend treatment group meetings in order to access the open-air fenced porch connected to the ward because access to the porch is integrated into the treatment program as a privilege.[4] Thus, the porch is cleared and locked during the meetings to encourage patients' attendance.

Western State Hospital's Hospital "Emergency Seclusion and Restraint Policy" authorized "physical restraints," "seclusion," and "pharmacological restraints" on patients. "Pharmacological restraint" meant the "[u]se of a medication that is administered involuntarily

---

[3] For example, patients in Ward 2-Elm are limited to the type and quantity of personal property allowed in their rooms at any one time. Patient rooms must be free of newspapers and must contain no more than four magazines or books and no more than a three-inch stack of papers. Unlike in Ward 2-Elm, patients granted higher privileges in less-secure "Psychosocial Rehabilitation Units" have more privileges, including access to a gym and a common area with a media library. NGRI patients like Plaintiff may not access those lower-risk areas, and Ward 2-Elm professional staff may not authorize a higher-risk patient's transfer to a Psychosocial Rehabilitation Unit or grant a higher-risk patient, like Plaintiff, the privileges available to a lower-risk patient.

[4] The porch is less secure than the rest of Ward 2-Elm with only two staff monitoring up to twenty-eight patients. Patients on "constant observation status" are not permitted access to the area for safety and security reasons.

for the control of an individual's behavior when that individual's behavior places him or others at imminent risk and the administered medication is not a standard treatme[n]t for the individual's medical or psychiatric condition." Seclusion meant "[t]he involuntary placement of an individual alone in an area secured by a door that is locked or held shut by a staff person, by physically blocking the door, or by any other physical or verbal means so the individual cannot leave it." Physical restraints, including "manual holds" and "mechanical restraints," prevent "a patient from freely moving his/her limbs or body to engage in a behavior that places him or others at risk of physical harm until such time as he/she is either calm [or] secluded . . . ." "Physical restraints" can range from manually holding a patient to strapping a patient into an Emergency Restraint Chair.

A doctor at Western State Hospital had approved an "Emergency Restraint Step Down Plan" to manage Plaintiff's non-redirectable, disruptive, and aggressive behaviors. This plan reads:

> In the event that Mr. Farabee will **not** follow staff direction or is engaging in verbal threats or disruptive behavior (including not following ward rules) but he is not physically aggressive, a Physician's order for **manual restraint** will be obtained to physically move him.
>
> If he continues to engage in verbal threats despite redirection but does not become physically aggressive, the next step will be use of the ERC. When he is calm, and meets standard hospital release criteria, he will be released from the ERC (no step down).
>
> If Mr. Farabee engages in **Physical aggression** towards others or himself that results in application of ERC; this plan for step wise reduction of physical restraint will be followed for safety of all:
>
> From Emergency Restraint Chair (ERC) you may progress out of physical restraint as follows:
>
> • From ERC reduce to 4pt ambulatory, then 2pt ambulatory (wrist), then 1pt ambulatory (not dominant hand out of restraint), then release

6

from all physical restraint based on individualized criteria (next bullet).

- **[E]ach step** of above reduction based on **4 hrs of consistent and consecutive** (4 hrs in a row while awake)
    o following staff direction,
    o **no** aggressive postures or behaviors,
    o **no** threats,
- [C]ontracting for safety of self and others
- The level of restraint may also be increased to the least restrictive level needed to maintain safety for all.

Pharmacological restraints, physical restraints, and seclusion "are interventions of last resort following attempts to intervene in a less restrictive, less invasive manner with the goal of ensuring the safety and protection of the patient and others at risk."[5] Usually, "the least restrictive device . . . that will effectively address the patient's behavior must be selected" if it is determined that restraint is necessary. However, a threat of harm to the patient or others may require emergency seclusion or restraint without first attempting less restrictive interventions. Seclusion and restraint were not allowed as punishment, for staff's convenience, as a substitute for treatment, or in a manner that causes undue physical discomfort or harm. Standing orders, known as "PRN" or "as needed" orders, for seclusion or restraint were prohibited.

## II.

Defendants filed a motion to dismiss that presents information outside the pleadings and argues, <u>inter alia</u>, the defense of qualified immunity. Because the court will not exclude the new information, the court treats the motion to dismiss as a motion for summary judgment.[6]

A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P.

---

[5] Less restrictive interventions include "verbal and behavioral interventions, recreational intervention, redirection, offering a less stimulating environment, and environmental modifications."

[6] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a <u>Roseboro</u> notice. <u>See</u> Fed. R. Civ. P. 12(d); <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir. 1975).

56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing admissible evidence and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.

The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the non[-]moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

A party is entitled to summary judgment if the admissible evidence as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). Opposition to summary judgment must be more than "simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

8

A government official sued via § 1983 in an individual capacity may invoke qualified immunity.  Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  "The doctrine of qualified immunity 'balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  The "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015); see In re Allen, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority.").  A "court may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case."  Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (internal quotation marks omitted).  A plaintiff's claim "survives summary judgment, however, only if [the court] answer[s] both questions in the affirmative."  Id.

## III.
### A.

Plaintiff challenges Herr's decision to transfer him to Western State Hospital instead of Eastern State Hospital.  Plaintiff believes that Herr is a friend of Dr. Yaratha, who was Plaintiff's treating physician at Central State Hospital.[7]  Plaintiff asserts without personal knowledge that Dr. Yaratha informed Herr, before the transfer to Western State Hospital, of a lawsuit Plaintiff

---

[7] Plaintiff had been civilly committed at Central State Hospital for approximately three years before the transfer to Western State Hospital.

had filed in the United States District Court for the Eastern District of Virginia against Dr. Yaratha and other hospital staff.[8]

Plaintiff concludes that Herr's decision to transfer Plaintiff to Western State Hospital instead of Eastern State Hospital was a product of retaliation for suing Herr's friends at Central State Hospital.

Herr is an administrator in the central office of the Department of Behavioral Health.

Herr explains the administrative reasons he sent Plaintiff to Western State Hospital:

> Sometime in August 2015, Mr. Farabee was transferred to another unit within CSH's Building 39 in an effort to provide him a fresh start with a new treatment team. However, on September 1, 2015, in talking with CSH Director Rebecca Vauter, I became aware of a series of events which left me with significant concerns about the entire program's ability to effectively engage him in treatment and to maximize his opportunity to transition to a less restrictive treatment setting. Specifically, Mr. Farabee was very well known throughout the Maximum Security Unit for his extremely challenging and unpleasant behaviors, such as smearing feces, making repeated false allegations of neglect and abuse against multiple staff, and for physically attacking others. His pattern of behaviors was both so frequent and so intense that even his newly assigned treatment team and nursing staff were having a difficult time remaining therapeutic with him.

> Further, CSH had recently sought consultation with DBHDS' Central Office regarding Mr. Farabee's appropriateness for civil transfer. After consultation with my peers, I concluded that, even though they were challenging, Mr. Farabee's clinical condition and behaviors were such that they could be managed in a civil setting.

_____

[8] In support of this assertion, Plaintiff cites to docket entry 41 in Farabee v. Yaratha, No. 2:14cv118 (E.D. Va.), which is a brief filed by the Office of the Attorney General on behalf of Dr. Yaratha and other defendants. On page eight, counsel for Yaratha wrote, "The facts are that Dr. Yaratha sought and arranged for Farabee to be transferred from [Central State Hospital] to [Western State Hospital] . . . ." There is no citation in support of counsel's statement or any reference to Herr, and none of the defendants' affidavits attached to the brief support the proffer. The proffer is not admissible evidence in this case, and the court will not take judicial notice of a purported fact passingly noted in a different case. Compare Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting a court may take judicial notice of the existence of complaints and pleadings in other courts), with S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426-27 (3rd Cir. 1999) (noting a court may not take judicial notice of truth of facts recited in another case).

My decision to transfer Mr. Farabee to a civil unit outside CSH was made to provide him with another opportunity to engage in meaningful treatment services in a less restrictive setting, a "fresh start."

I made the decision to transfer Mr. Farabee to Western State Hospital (WSH) rather than to Eastern State Hospital (ESH), because WSH had a seasoned clinical leadership team that was better situated to provide Mr. Farabee with the opportunities I felt he needed. At that time, ESH was experiencing significant pressures on many fronts simultaneously; i.e., ESH had a relatively new Director, ESH was dealing with the possibility of the closure of Hancock Geriatric Treatment Center, ESH was coping with multiple re-occurring findings from the Centers for Medicare & Medicaid Services (CMS), and ESH was weathering the most dramatic increase in admissions of any of the state psychiatric hospitals.

In my professional opinion, WSH was better situated than ESH to provide the care Mr. Farabee needed at that point in time. . . .

I never had any written or verbal communication with either Dr. Gardella or Dr. McFarland regarding Mr. Farabee's transfer to WSH. I had no involvement with any decisions made by anyone at WSH regarding Mr. Farabee or his treatment at WSH.

Herr avers he had no knowledge of Plaintiff's lawsuit against Dr. Yaratha until thirteen days after he decided to send Plaintiff to Western State Hospital. Herr was included in an email sent on September 14, 2015, to the Office of the Attorney General of Virginia after a defendant received legal notice of the action. A court order about service was entered in that case on September 8, 2015, which was seven days after Herr made his decision.

For a claim of retaliation to survive summary judgment, the plaintiff must produce sufficient evidence that (1) the speech was protected, (2) the alleged retaliatory action adversely affected the protected speech, and (3) a causal relationship existed between the protected speech and the retaliation. Raub, 785 F.3d at 885, cited by Hoye v. Gilmore, 691 F. App'x 764, 765 (4th Cir. 2017). Bare assertions of retaliation do not state an actionable claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Adams v. Rice, 40 F.3d 74-75 (4th Cir. 1994).

11

"[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." Am. Civ. Liberties Union v. Wicomico Cnty., 999 F.2d 780, 785-86 n.6 (4th Cir. 1993) (quoting Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). Thus, "[i]n order to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." Constantine, 411 F.3d at 501. Courts can infer causation when the adverse action occurs shortly after a plaintiff engaged in a protected activity. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015). However, defendants can offer a legitimate and permissible reason for their actions to refute such evidence. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 217 (4th Cir. 2016). Even after defendants have offered a legitimate reason, a plaintiff can still prevail on his claim if the evidence as a whole may demonstrate that the proffered permissible reason is merely a pretext. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).

Herr is entitled to qualified immunity and summary judgment for the retaliation claim. Herr describes the legitimate bases why Plaintiff's transfer to Western State Hospital was in Plaintiff's best interests instead of Eastern State Hospital or Central State Hospital. Plaintiff's own conclusory accusation is not based on personal knowledge and fails to establish Herr's personal knowledge of protected activity. See, e.g., Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988) (conclusory assertions about defendant's motivation and state of mind not sufficient to withstand summary judgment). There is no evidence suggesting that Herr's reasoning is a pretext for an ulterior motive. Furthermore, Plaintiff fails to establish that the transfer from one state hospital to another adversely affected the protected speech as anything

more than a de minimis inconvenience.  See, e.g., Wicomico Cnty., 999 F.2d at 785-86 n.6

(recognizing the alleged retaliation must result in more than a de minimis inconvenience to state

a claim).  Moreover, the timing of the transfer alone does not overcome Herr's convincing, non-

retaliatory explanation.  See, e.g., Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1066

(10th Cir. 2009).  Accordingly, Herr is entitled to qualified immunity and summary judgment for

the retaliation claim.

## B.

Dr. Gardella and Dr. McFarland are entitled to qualified immunity and summary

judgment for the claims about the transfer to Western State Hospital or assignment to Ward 2-

Elm.  Section 1983 requires a showing of personal fault on the part of a defendant either based

on the defendant's personal conduct or another's conduct in execution of the defendant's policies

or customs.  See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).  Neither Dr. Gardella

nor Dr. McFarland had any involvement with Plaintiff's assignment to Western State Hospital or

Ward 2-Elm, and they could not order him out of Ward 2-Elm.  Instead, Herr assigned Plaintiff

to Western State Hospital, and the hospital's administrative staff assigned Plaintiff to Ward 2-

Elm.  Accordingly, Dr. Gardella and Dr. McFarland are entitled to qualified immunity and

summary judgment for these claims because Plaintiff fails to establish their personal

involvement.

## IV.

Plaintiff argues that the conditions he experienced in Ward 2-Elm, allegedly imposed by

Defendants, violated his liberty interests protected by the Fourteenth Amendment.[9]  Plaintiff

---

[9] Plaintiff does not present a legal basis to support his citation to the Ninth Amendment, and the court will
not extrapolate an argument on his behalf.  See, e.g., Strandberg v. Helena, 791 F.2d 744, 748 (9th Cir. 1986)
("[T]he [N]inth [A]mendment has never been recognized as independently securing any constitutional right, for

alleges that Dr. Gardella had entered two standing orders: one allowing Plaintiff to be placed in the Emergency Restraint Chair and another allowing staff to use a pharmacological restraint. Plaintiff alleges that Dr. Gardella and Dr. McFarland had caused Plaintiff to be "continuously isolated" during "the entire time" he was at Western State Hospital. Finally, Plaintiff alleges that his assignment to Ward 2-Elm constituted imprisonment and/or seclusion and violated a "freedom to associate" with non-institutionalized people. Plaintiff generally faults Herr, too, for the experiences in Ward 2-Elm.

Defendants are entitled to qualified immunity and summary judgment for these claims because Plaintiff fails to support his accusations with evidence based on personal knowledge. The record does not support an inference that Dr. Gardella or Dr. McFarland had any involvement with Plaintiff's assignment to assignment to Ward 2-Elm or standing orders for pharmacological restraints. Dr. McFarland had not ordered physical restraints, and Dr. Gardella's orders for physical restraints were not unreasonable. Also, the record shows that Plaintiff was not continuously isolated during "the entire time" he was at Western State Hospital, and any general "freedom of association" was lawfully curtailed as a consequence of his civil commitment. Lastly, the record is devoid of Herr's involvement with Plaintiff's care or experiences in Ward 2-Elm. Cf. Shaw, 13 F.3d at 799.

## A.

Dr. Gardella and Dr. McFarland are entitled to qualified immunity and summary judgment for the claims about an alleged standing order for pharmaceutical restraint. On the day Plaintiff arrived at Western State Hospital but before he arrived at Ward 2-Elm, the admitting

---

purposes of pursuing a civil rights claim."); see also Jardine v. Graham, 471 F. App'x 525, 528 (7th Cir. 2012) (noting a baseless claim under § 1983 and the Ninth Amendment is frivolous and does not warrant discussion).

physician on duty ordered a single, 100 m.g. oral dose of chlorpromazine.[10] This physician also

issued a "PRN" order for 100 m.g. of chlorpromazine up to every four hours after Plaintiff was

admitted to Ward 2-Elm. Neither Dr. Gardella nor Dr. McFarland authorized any standing order

for a pharmaceutical restraint.[11]

## B.

Dr. Gardella and Dr. McFarland are entitled to qualified immunity and summary

judgment for the claims about physical restraints. The record reveals that Dr. Gardella exercised

professional judgment when ordering them and that Dr. McFarland had no involvement with

such orders.

Although in the custody of the state, Plaintiff cannot be punished while civilly committed

because an insanity acquittee has not been convicted of a criminal offense. See, e.g., Jones v.

United States, 463 U.S. 354, 369 (1983). Involuntarily committed individuals must be afforded

adequate food, shelter, clothing, reasonable medical care, reasonable safety, and reasonably non-

restrictive conditions "except when and to the extent professional judgment deems [it] necessary

to assure such safety or to provide needed training." Youngberg v. Romeo, 457 U.S. 307, 324

(1982). "[D]ecisions made by the appropriate professional are entitled to a presumption of

correctness" to limit the scope of judicial interference with the internal operations of a state

institution. Id. at 322-23 (citing Bell v. Wolfish, 441 U.S. 520, 539 (1970) ("[I]nquiries into the

conditions of confinement spring from constitutional requirements and judicial answers to them

---

[10] Chlorpromazine, also known as Thorazine, is an antipsychotic drug that had been used to treat Plaintiff at Central State Hospital.

[11] Plaintiff received a "PRN" dose of chlorpromazine on September 12, 2015, after having been in the Emergency Restraint Chair for approximately three and a half hours. Despite that passage of time, Plaintiff remained defiant and aggressive, spitting on the face of the nurse who conducted an hourly assessment. Even if, arguendo, Dr. Gardella had authorized the pharmacological restraint at this time, it does not appear that its use was unreasonable or disproportionate in light of Plaintiff's behavior. See discussion infra Section IV.B.

must reflect that fact rather than a court's idea of how best to operate a facility.")). Thus, a professional state actor's decision that infringes on a protected interest is "presumptively valid" and violates a liberty interest "only when the decision . . . is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323.

The record shows that Dr. Gardella exercised professional judgment when ordering physical restraints, which triggered the Emergency Restraint Step Down Plan developed and ordered by a non-defendant. Dr. Gardella learned about Plaintiff's propensity for aggression and self-harm from Plaintiff's NGRI report, and staff had informed Dr. Gardella of Plaintiff's aggressive or disruptive act immediately before Dr. Gardella issued each order for restraint. While Plaintiff complains that a less forceful intervention should have been pursued first, Dr. Gardella explains that seclusion was not a safe intervention on account of Plaintiff's significant past history of self-harm detailed in the NGRI report.

Dr. Gardella was responsible for one of the three times Plaintiff was confined in the Emergency Restraint Chair.[12] Dr. Gardella approved a restraint order on October 7, 2015, at

_____

[12] Plaintiff alleges briefly in the amended complaint that he was "continuously isolated and/or secluded" at Western State Hospital. The record refutes this conclusory allegation. Plaintiff was in the Emergency Restraint Chair for approximately thirty-two hours total while at Western State Hospital between September 10 and October 13, 2015. Also, most of this time was not the fault of a defendant.

A non-defendant doctor authorized restraints at 12:05 p.m. on September 12, 2015, approximately five minutes after Plaintiff reportedly attacked a nurse. Plaintiff was placed in the Emergency Restraint Chair, and the first hourly assessment note from around 1:00 p.m. reported that Plaintiff yelled and spat at the nurse who checked on him. At around 1:34 p.m., 100 mg of chlorpromazine was injected into Plaintiff. At around 2:00 p.m., the hourly assessment note reported that Plaintiff complained that the "meds were forced on him . . . [when] [staff] gave him a [PRN] to help calm him down to get him out of restraints." Plaintiff was briefly released from the restraints around 2:00 p.m. for a break, during which the report said Plaintiff opted to stretch. The non-defendant doctor who authorized restraints reviewed Plaintiff's progress at around 8:11 p.m., by which time Plaintiff had "stepped down" to 2-point ambulatory restraints with a waist belt and under direct observation. Plaintiff was released from restraints entirely by midnight after satisfying the Emergency Restraint Step Down Plan.

On October 11, 2015, at around 4:45 a.m., a non-defendant authorized restraints after it was reported Plaintiff became disruptive, destructive, and dangerous. Since Plaintiff was not specifically assaultive toward another person, he did not have to "step down" through the various stages of the Emergency Restraint Step Down

around 2:20 p.m. after Plaintiff reportedly attacked a nurse. The Emergency Restraint Step Down Plan was implemented, and Plaintiff was restrained in the Emergency Restraint Chair. Plaintiff progressed through the Emergency Restraint Step Down Plan as reflected in the hourly assessments, and he was released from restraints approximately sixteen hours later on October 8, 2015, at 6:00 a.m.

The record shows that Dr. Gardella exercised professional judgment when ordering physical restraints on September 14, 15, and 16, 2015. He approved each order after Plaintiff reportedly refused to leave the porch when it needed to be closed during treatment group meetings. Dr. Gardella noted that Plaintiff was not aggressive but was not following staff's directions to leave the porch. As a consequence, staff briefly escorted Plaintiff out of the porch so it could be locked.[13]

Plaintiff fails to overcome the presumption of correctness given Dr. Gardella's professional judgment to temporarily authorize physical restraints. The restraints implemented do not appear unreasonable or disproportionate given Plaintiff's behaviors immediately preceding the decisions. See Youngberg, 457 U.S. at 322-23 (noting professional judgments are entitled to a presumption of correctness). Accordingly, Dr. Gardella is entitled to qualified immunity and summary judgment for these claims.

## C.

Defendants are entitled to qualified immunity and summary judgment for the claim they violated a right of "free association" with non-institutionalized people or "isolated" him by not allowing him to leave Ward 2-Elm. "[C]ommitment for any purpose constitutes a significant

Plan. Consequently, he was released from the Emergency Restraint Chair within four hours.
[13] A non-defendant doctor ordered physical restraint for the same reasons and with the same consequence on October 2, 2015.

deprivation of liberty . . . ." Addington v. Texas, 441 U.S. 418, 425 (1979). To the extent

Plaintiff seeks to hold Defendants liable for him generally not freely associating with non-

institutionalized people or leaving the ward to which he was committed, the claim is frivolous.

The Circuit Court lawfully limited that ability as a consequence of finding it necessary to commit

Plaintiff to the Department of Behavioral Health, which assigned him to Ward 2-Elm. Plaintiff

otherwise fails to plead any basis, beyond his mere conclusion, for a reasonable trier of fact to

conclude that any defendant denied him a clearly-established right to associate with non-

institutionalized people or leave his place of civil commitment. See Twombly, 550 U.S. at 555

(noting reliance on labels and conclusions is insufficient to plead a claim); see also City of Dallas

v. Stanglin, 490 U.S. 19, 23 (1989) (discussing a right of association about politics); Hodge v.

Jones, 31 F.3d 157, 163-64 (4th Cir. 1994) (same about family).

## V.

Plaintiff alleges that Defendants violated his right to be free from discrimination under

the Americans with Disabilities Act ("ADA") by depriving him of "clinically recommended"

treatment, ostensibly Dialectical Behavioral Therapy ("DBT"), by "subject[ing] him to

unnecessary isolation." Title II of the ADA provides that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132. A "public entity" includes the Department of

Behavioral Health. Id. § 12131(1).

## A.

Title II of the ADA recognizes a cause of action for discrimination against public entities,

not against private individuals. Baird v. Rose, 192 F.3d 462, 471 (4th Cir. 1999). Accordingly,

Plaintiff cannot pursue ADA claims against Defendants in their individual capacities, and they are entitled to qualified immunity and summary judgment in that respect.

**B.**

The ADA claims against Defendants in their official capacities constitute claims against the Commonwealth of Virginia. See, e.g., Hafer v. Melo, 502 U.S. 21, 25 (1991); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Plaintiff seeks damages and an injunction to transfer to Eastern State Hospital but not its forensic unit.

To establish that a public entity violated Title II of the ADA, a plaintiff must show that: (1) he is a person with a disability as defined by statute, (2) he is otherwise qualified for the benefit in question, and (3) he is excluded from the benefit due to discrimination based upon disability. 42 U.S.C. § 12132; see, e.g., Doe v. Univ. of Md. Med. Sys., 50 F.3d 1261, 1265 (4th Cir. 1995). With regard to this third element, there are three distinct grounds upon which relief may be granted: (1) intentional discrimination or disparate treatment; (2) disparate impact; or (3) failure to make reasonable accommodations. Adams v. Montgomery College, 834 F. Supp. 2d 386, 393 (D. Md. 2011).

Assuming that Plaintiff has the requisite disability and qualified for a benefit, Plaintiff does not establish how he was prevented from participating in or benefiting from a program or service because of his disability. On the contrary, Plaintiff acknowledges he had access to, inter alia, therapy, the porch, mental health treatment staff, and medical care. Plaintiff is not permitted to design his own treatment plan, and he did not comply with a treatment plan for the NGRI Graduated Release Process. Furthermore, Plaintiff fails to establish that a decision to deny him DBT was motivated by an unjustified consideration of his disabled status. See, e.g., Pathways Psychosocial, et al., v. Town of Leonardtown, MD, 133 F. Supp. 2d 772, 781 (D. Md. 2001).

19

As to damages, Title II of the ADA abrogates state sovereign immunity to the extent it creates a private action for damages against States for unconstitutional conduct.  United States v. Georgia, 546 U.S. 151, 159 (2006).  For the reasons already discussed about the claims pursued under § 1983, Plaintiff fails to establish a defendant's unconstitutional conduct, and damages are not an available remedy.  Cf. Rowley v. McMillan, 502 F.2d 1326, 1331 (4th Cir. 1974) (recognizing sovereign immunity does not bar a claim for equitable relief).

Plaintiff further fails to establish an entitlement to prospective equitable relief due to his experiences for thirty two days in 2015.  "[P]ast exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief 'absent a sufficient likelihood that he will again be wronged in a similar way.'"  Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (quoting Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)).  Plaintiff fails to demonstrate a "realistic threat" of, arguendo, suffering similar "wrongs" in the future or "continuing, present adverse effects."  See, e.g., Perry v. Sheahan, 222 F.3d 309, 313-14 (7th Cir. 2000).  Plaintiff is presently in the custody of the VDOC, and his fear about physicians' future orders is too speculative for the court to fashion appropriate relief.  Indeed, "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference[,]" especially for future treatments based on a future state of mind.  Olmstead v. L. C. by Zimring, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring).  Accordingly, Defendants are entitled to summary judgment for the ADA official capacity claims.

## VI.

Plaintiff accuses Defendants of failing to follow various state policies and procedures.  However, a claim that public officials have not followed their own policies or procedures does not amount to a constitutional violation.  See, e.g., Riccio v. Cnty. of Fairfax, Virginia, 907 F.2d

1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990) ("[F]ailure to follow procedures established for the general protection and welfare of inmates does not constitute deliberate disregard for the medical needs of a particular [inmate]."). Also, Plaintiff fails to establish that any defendant was responsible in an official capacity for any policy or procedure to which he cited in support of his claims. Thus, Defendants are entitled to qualified immunity and summary judgment for such accusations.

## VII.

For the foregoing reasons, the court grants Defendants' motion for summary judgment as to the federal claims. Pursuant to 28 U.S.C. § 1367(c), the court declines to exercise supplemental jurisdiction over any state law claim that could be liberally construed from the amended complaint.[14]

**ENTER:** This _____ 11 R _____ day of January, 2018

/s/ Michael F. Urbanski
Chief United States District Judge

---

[14] Plaintiff invokes the Virginia Administrative Code as a basis for this action, but he fails to substantiate how he has an actionable legal cause under that code. As the court is not sure what state law, if any, Plaintiff may be pursuing, any state law claim is dismissed without prejudice.