IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BRIAN FARABEE, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:16cv00326 |
| | ) | |
| v. | ) | |
| | ) | |
| DR. ROBERT GARDELLA, et al., | ) | By: Michael F. Urbanski |
|     Defendants. | ) | Chief United States District Judge |

## MEMORANDUM OPINION

This court previously granted summary judgment in defendants' favor, and pro se plaintiff Brian Farabee appealed. In a per curiam opinion issued on September 24, 2020, the United States Court of Appeals for the Fourth Circuit dismissed plaintiff's appeal, concluding that this court's order was not a final, appealable order because the court had not addressed all of Farabee's claims. ECF No. 62. It thus remanded to this court for consideration of "Farabee's claim in Count I of the complaint that Defendants violated his due process rights under the Fourteenth Amendment by denying him clinically recommended mental health treatment." ECF No. 62 at 2; Farabee v. Gardella, No. 18-6146 (4th Cir. Sept. 24, 2020) (per curiam).[1]

Upon remand, this court directed defendants to file a supplemental summary judgment motion addressing that single claim. ECF No. 66. They did so, Farabee has responded, and the motion is ripe for disposition. For the reasons set forth herein, the

---

[1] The court's prior opinion had addressed Farabee's claim in Count I that he was denied "clinically recommended" treatment by "subjecting him to unnecessary isolation," but construed that as a claim brought under the Americans with Disabilities Act. Mem. Op. 18–20, ECF No. 52. It also had addressed separately his Fourteenth Amendment claim based on the isolating conditions he experienced while confined. Id. at 13–15.

court will grant defendants' supplemental motion for summary judgment as to the remaining claim.

## I. BACKGROUND

The factual background of this case was discussed in detail in the court's prior memorandum opinion granting summary judgment. ECF No. 52 at 1–7. The court will not repeat most of that detail here, but will instead provide only a general background and set forth facts relevant to the one claim now before it.[2] In that claim, Farabee alleges that defendants failed to provide him with dialectical behavior therapy ("DBT") during his brief stay in 2015 at Western State Hospital ("WSH"). Other treatment providers—Dr. Kevin McWilliams in 1998 and Drs. Torres and Ewell in 2012 and 2013—previously had recommended DBT for Farabee or said he needed it. Farabee alleges that, instead of providing him with that treatment, the defendants simply kept him isolated and confined to his ward.[3]

Farabee was housed at WSH only for about a month—from September 10, 2015, until October 15, 2015. At the time, Farabee was in the custody of the Virginia

---

[2] The summary judgment evidence before the court includes the affidavits of Drs. Gardella and McFarland, with attachments, submitted by defendants. In opposition, Farabee has offered a sworn declaration. Farabee Decl., ECF No. 73-1. Moreover, his opposition incorporates portions of his prior opposition and affidavit attached thereto, as well as the informal briefs he filed with the Fourth Circuit while the case was on appeal. Opp'n to Supp. Mot. Summ. J. 3 (incorporating ECF No. 47 at 5–8 and ECF Nos. 17-1 and 39 from Farabee v. Gardella, No. 18-6146 (4th Cir.)). Lastly, because his amended complaint is verified, Am. Compl. 17, ECF No. 37, the court treats the factual allegations therein, if based on personal knowledge, as an affidavit in opposition to summary judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[3] The court already granted summary judgment to defendants as to Farabee's allegations of being isolated, finding that the isolation did not constitute a Fourteenth Amendment violation. ECF No. 52 at 13–15.

Department of Behavioral Health and Developmental Services ("BDHDS") for continued civil commitment. His detention stemmed back to 1999, when he was adjudged not guilty by reason of insanity ("NGRI") of a criminal charge. He was later convicted of a separate criminal offense and was held in the custody of the Virginia Department of Corrections for several years, but had been released back into BDHDS custody in 2012, again as an NGRI detainee.

The three defendants in the case are Dr. Robert Gardella, who was Farabee's treating psychiatrist at WSH, Dr. Christy McFarland, who was Farabee's treating psychologist at WSH, and Daniel Herr, the BDHDS official who made the decision to transfer Farabee from Central State Hospital to WSH.

According to the affidavits of Drs. Gardella and McFarland, Farabee was assigned to Ward 2-Elm by WSH administrators, not by defendants. Gardella Aff. ¶ 10(b), ECF No. 68-1; McFarland Aff. ¶ 10, ECF No. 68-2. Prior to his arrival, moreover, a Forensic Review Panel ("FRP") determined what privileges he could have while at WSH, as it does for all NGRI patients. The FRP is a Commissioner-appointed board that determines disposition and privileges of NGRI patients under Virginia Code § 19.2-182.13. Gardella Aff. ¶ 10(b). Ward 2-Elm patients are subject to more restrictions than patients in other wards at WSH, and Ward 2-Elm typically receives higher risk patients. Id. Dr. Gardella believes that Farabee likely was assigned to that ward based on his past history of serious aggression toward others and the lack of privileges granted by the FRP. Id.

The day after his arrival at WSH, Farabee met with his treatment team and WSH's Human Rights Advocate. Dr. Gardella avers that, during that meeting, Farabee was unwilling to discuss the process of NGRI gradual release or how he could earn privileges.

3

Nonetheless, the team encouraged him to participate in the treatment program including attending groups (off the unit) and meeting with professional staff weekly to revise his treatment plan so he could be eligible to earn privileges and transfer to one of WSH's other, less restrictive units.

Patients on the less restrictive units, known as a Psychosocial Rehabilitation ("PSR") Units, are granted more privileges than Ward 2-Elm patients, including access to a less secure common area that includes a media center (library) and gym. Id. ¶ 10(c). Dr. Gardella avers, though, that those areas of the hospital are not available to NGRI individuals without privileges being granted by the Internal Forensic Privileging Committee ("IFPC") or FRP, and that neither he nor Dr. McFarland had authority to grant Farabee such privileges. Id.

Dr. Gardella's testimony on this point is corroborated by Dr. McFarland, who states that Farabee "was subject to the same rules as other NGRI acquitees at WSH, and we, the members of his treatment team, did not have the authority to grant him further privileges for the time he was in our care." McFarland Aff. ¶ 11(b). She also notes that Farabee's "behavior while he was at WSH, specifically his refusal to eat for lengthy periods, telling staff that he wanted to die, and his aggressive behavior toward staff, would not have supported a request for high privileges from the [IFPC]." Id.

With regard specifically to DBT treatment, Dr. Gardella avers that Farabee was assigned to a group during his time at WSH to receive DBT group therapy. He was unwilling, however, to attend any groups; instead, he insisted on individual DBT. To attempt to accommodate him, a WSH psychologist who was not part of Farabee's treatment team was asked to develop a plan to offer Mr. Farabee individual therapy sessions. Dr.

4

Gardella explains Mr. Farabee's response:

> [T]he psychologist asked for Mr. Farabee to identify things about himself that he would like to work on in preparation for individual sessions, but Mr. Farabee did not identify any. He also refused to attend treatment team meetings with professional staff intended to modify and develop his treatment plan, also an ideal forum to identify goals for the individual therapy he was demanding. Mr. Farabee was offered the opportunity to meet with his treatment team weekly. This weekly treatment planning conference meeting does not include any other patients and is also a treatment modality, but he consistently refused to meet with his treatment team.

Garadella Aff. ¶ 10(d); see also McFarland Aff. ¶ 11(c)–(e) (providing much of the same information, including that Farabee refused group DBT and that "[a] plan was in process to offer Mr. Farabee individual therapy sessions when he left WSH").

Farabee contends that defendants are lying in their affidavits, but much of the evidence he presents to counter their testimony is either conclusory or not based on his personal knowledge. Moreover, to the extent that his allegations create disputes of fact, they are not material and do not preclude summary judgment for defendants.

As relevant here, Farabee's factual contentions address either the treatment offered him or relate to the restrictions imposed on him to isolate him and the two are interrelated. First, he makes the overarching contention that defendants purposefully isolated him to retaliate against him for filing civil lawsuits against officials at CSH, and he states that they told him that is what they were doing.[4] Farabee 2020 Decl. ¶¶ 4–5, 8, ECF No. 73-1.

---

[4] The court previously granted summary judgment as to any retaliation claim based on his transfer to WSH and as to any claim concerning his assignment to Ward 2-Elm. Mem. Op. 9–13. In doing so, the court noted that "[n]either Dr. Gardella nor Dr. McFarland had any involvement with Plaintiff's assignment to [WSH] or Ward 2-Elm, and they could not order him out of Ward 2-Elm." Id. at 13.

Defendants have flatly denied this accusation, Gardella Aff. ¶ 8; McFarland Aff. ¶ 10, and Farabee has not set forth any additional evidence to suggest that either defendant made treatment decisions or "isolated" him based on any civil complaints he had filed. Merely claiming that they did so is insufficient to create a dispute of fact. To the extent Farabee says that they told him that is what they were doing, no reasonable jury would believe that testimony. He presents nothing to suggest that either of these mental health providers had any reason to retaliate against him.

Second, he disputes defendants' contention that they could not modify the rules set for Ward 2-Elm NGRI inmates and that they could not give him more privileges absent approval by the IFPC/FRP. For example, he argues in his opposition (although this information is not in his attached affidavit) that the ward rules are "approved" by a Local Human Rights Committee" ("LHRC"), and that the members of that committee are "arbitrarily hand-pick[ed]" by defendants to "agree with their own rules." Opp'n Supp. Mot. Summ. J. 5–6, ECF No. 73. Essentially, he argues that the LHRC rules are effectively created by defendants through using LHRC as a rubber-stamp or proxy. He does not include this information in his affidavit, however, and regardless, he offers no facts based on personal knowledge to support these allegations.

He also argues that because the LHRC committee members are "not mental health professionals," defendants may not rely on the rules or policies created by the LHRC to control their treatment decisions and that doing so would be a failure to exercise professional judgment. Id. Nowhere do Drs. Gardella and McFarland state that they could not provide him a particular treatment because of these rules, however. Nor have they stated that they disagreed with any of the rules or that they believed those rules should have

been modified or exceptions made for Farabee. See McFarland Aff. ¶ 11(b) (explaining that Farabee's behavior did not warrant additional privileges or loosening of the rules). They merely stated that they did not make the rules, and that it was Farabee's assignment to Ward 2-Elm and its rules that led to much of the "isolation" about which he complains.

Farabee also flatly states that it is not true that they could not grant him more freedom without IFPC/FRP privileges, and, for support, he points to the fact that he was given more freedom while a patient at CSH. But what occurred at CSH does not undermine these providers' testimony that they could not unilaterally alter his privileges at WSH, and his mere contention that they could—which stands in contrast to their testimony—is not "evidence" of a fact, but merely a conclusory statement unsupported by fact. Accordingly, none of his assertions with regard to who had authority to grant him additional privileges create a dispute of fact that precludes summary judgment.

With regard specifically to DBT treatment, Farabee admits that he wanted individual DBT therapy, and he insists that, while at WSH, he was never offered or prescribed DBT. Farabee 2017 Decl. ¶¶ 10–11, ECF No. 47-2. He further contends that Drs. Gardella and McFarland "lied about offering him groups off of the 2 Elm Unit and that it is completely fictitious that an unnamed psychologist met with plaintiff to offer him DBT treatment." See Farabee 2020 Decl. ¶ 9 (denying ever being approached by any psychologist while at WSH and asked if there were things he would like to work on). Instead, his affidavit states that Drs. Gardella and McFarland told him that DBT therapy would not be made available to him until he was transferred to Eastern State Hospital. Farabee 2020 Decl. ¶ 3. He does not expressly deny that he was offered DBT group therapy, but, as noted, he insists that he was not offered groups off his ward.

## II. DISCUSSION

The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

### A. Defendant Herr

As an initial matter, the court notes that Farabee does not allege that Herr was responsible for the denial of any medical treatment or other care at WSH. As the court noted in its prior opinion, "the record is devoid of Herr's involvement with Plaintiff's care of experiences in Ward 2-Elm." Mem. Op. 14. Likewise, Farabee's opposition to the supplemental summary judgment motion does not provide any information implicating Herr in any alleged Fourteenth Amendment violation.

Thus, to the extent that Herr was intended as a defendant to Farabee's Fourteenth Amendment claim regarding being denied treatment, Herr is entitled to summary judgment in his favor. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (explaining that liability under § 1983 is "personal, based upon each defendant's own constitutional violations").

**B. Defendants Gardella and McFarland**

As to the other two defendants, the court concludes that they are entitled to summary judgment and to qualified immunity as to Farabee's Fourteenth Amendment claim alleging a denial of clinically recommended treatment.[5]

The Due Process Clause of the Fourteenth Amendment entitles persons who have been involuntarily committed to adequate food, shelter clothing, and medical care. Youngberg v. Romeo, 457 U.S. 307, 324 (1982). They are also entitled to conditions of reasonable care and safety and such training as may be required by those interests. Id. at 324. In determining whether a State has met its obligations, decisions made by the appropriate professional are entitled to a presumption of correctness. Thus, a medical provider may be liable under the Fourteenth Amendment only where there is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

In other lawsuits brought against other DBHDS medical professionals at other facilities, Farabee also has claimed that he was denied proper mental health treatment when

---

[5] The court's prior opinion set forth the legal standard for granting qualified immunity and that standard is incorporated by reference here. Mem. Op. 9.

9

he was not given DBT. In one such case, the Fourth Circuit reversed the district court's finding for Farabee on his Fourteenth Amendment claim after a trial. Farabee v. Yaratha, 801 F. App'x 97 (4th Cir. 2020). The court explained:

> "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Patten v. Nichols, 274 F.3d 829, 836 (4th Cir. 2001) (quoting Youngberg, 457 U.S. at 321, 102 S. Ct. 2452). Courts must simply ensure that the "choice in question was not a sham or otherwise illegitimate." Id. at 845 (emphasis omitted) (quoting Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir. 1980)). This standard is more deferential to doctors than negligence or medical malpractice standards. Id. Plaintiffs bear the burden of proof by a preponderance of the evidence. See id. at 843–46.

Id. at 103. Elsewhere in the opinion, the court emphasized that "[t]here is a middle ground between a good decision and a 'sham' decision." Id. at 104 (citing Patten, 274 F.3d at 845).

Here, there simply is not sufficient evidence from which any jury could conclude that Drs. Gardella or McFarland so deviated from accepted professional judgment, practice, or standards such that their decisions were not based on their own professional judgment. Youngberg, 457 U.S. at 323. Accordingly, their treatment decisions regarding Farabee—which included offering him group DBT therapy and beginning a process to provide him individual DBT therapy—are entitled to a presumption of correctness.

In the face of their efforts, the overwhelming evidence is that Farabee was noncompliant with his treatment and would not participate in his own treatment. Although Farabee offers conclusory statements that he was not permitted to go to groups off the ward and that he was never offered DBT, this testimony, without more, cannot defeat summary judgment. It appears true that he was not offered individual DBT during the month that he was at WSH, although a process was beginning to provide that treatment. As noted, Drs.

Gardella and McFarland have both testified that a plan for individual DBT for Farabee was in the process of being prepared at the time he left WSH. And although Farabee insists that is not true, he offers no facts based on personal knowledge to dispute that testimony.

With regard to group DBT treatment, his conclusory statements about not being permitted to attend groups do not overcome the overwhelming evidence that he was, in fact, offered DBT in a group therapy setting. In addition to defendants' testimony, the documentation available from his time at WSH supports that he was offered group DBT therapy. Moreover, he does not dispute that he refused some treatment while at WSH. For example, he never denies refusing to attend treatment team meetings, and that pattern of refusal is reflected throughout the documentation available to the court. It particular, it is noted extensively in the report CSH provided to WSH upon his transfer there, that

> Mr. Farabee has a history of medication and treatment noncompliance . . . He has been offered psychosocial groups on the ward as well as individual therapy with the staff psychologist. He has refused to attend the psychosocial groups and has refused to meet with the staff psychologist. He has regularly refused to meet with the Treatment Team to discuss his current clinical status as well as possible future movement through the NGRI process.

Gardella Aff., Attachment A, at 15, ECF No. 68-1 at 26.

Although in some cases, testimony similar to Farabee's might be sufficient to create a dispute of genuine fact, here, his testimony is conclusory, limited, and unsupported by anything else in the record. By contrast, the testimony of Drs. Gardella and McFarland is

11

supported by other documents in the record.[6] As noted, the detailed information available to the court supports that Farabee has a pattern and history of refusing treatment and being noncompliant with treatment, including (specifically), a failure to attend groups and treatment team meetings. Given the totality of the record before the court, there simply is not sufficient evidence from which a reasonable jury could find in his favor on this claim. See Anderson, 477 U.S. at 249–50 (explaining that where "the evidence is merely colorable, or is not significantly probative," summary judgment is proper).[7]

In short, the undisputed evidence reflects that defendants exercised professional judgment as to how to treat Farabee, and not simply a "sham" judgment. He was eligible

---

[6] He claims that his medical records were falsified to state he was refusing group treatment. For support, he points to two medical records on 10/30/2015 and 11/20/2015, which he describes as stating that he offered and refused group therapy, despite the fact that Farabee was not at WSH on those dates. From this, he reasons that references elsewhere to his refusing therapy are falsified. The court has reviewed the documents on which Farabee relies, but he misreads them. Pl.'s Supp. Opening Brief, Exhibits 1-A & 1-B, Farabee v. Gardella, No. 18-6146 (4th Cir. filed July 10, 2020). First of all, the one dated October 30, 2015, has a handwritten note by a team member, who may be Dr. Gardella. Although not entirely legible, the note appears to refer to Farabee being in "jail/court through November 20, 2015." Thus, it is not "falsified" as he contends to suggest that he refused groups that week, but instead specifically notes that he is not at the facility. The second document has the box "Other" checked under the heading "Treatment Team Recommendations," and then states that Farabee has been "discharged, refused all groups." Taking the records together, the "refused all groups" clearly relates to his discharge and is a reference to the past refusals during his time there, rather than a reference to him refusing groups on that particular week. These documents provide no support for Farabee's assertion that Dr. Gardella falsified his medical records.

[7] Although the court does not make credibility determinations at the summary judgment stage, some of plaintiff's statements in his affidavit are so fanciful that no reasonable jury could credit them. For example, he denies ever assaulting nurses at WSH, and he asserts that Dr. Gardella told him that he had directed staff to falsely claim Farabee had assaulted them so that he could have an excuse to forcibly medicate and restrain Farabee. Farabee 2020 Decl. ¶¶ 14–15. The records attached to Dr. Gardella's affidavit, however, reflect that staff members, including a nurse, themselves submitted reports and provided information about Farabee assaulting them while at WSH. The documents appear to be written by the staff members and describe two separate assaults by Farabee, one in which he tried to choke a nurse and another in which he punched a security guard in the face. Especially given Farabee's extensive history of violent behavior—the record is replete with numerous incidents in which Farabee threatened and assaulted staff throughout the time he was civilly committed—no reasonable juror would believe that Dr. Gardella and numerous other staff members were engaged in some sort of conspiracy to lie in multiple written records about Farabee's assaults.

for group DBT therapy and other therapies, but he was uncooperative and did not attend those groups. Provisions were also made to offer him individual DBT therapy, but those plans apparently did not come to fruition in the short time he was housed at WSH. He simply cannot show that he was denied clinically recommended treatment. On the record before the court, then, no reasonable juror would conclude that either Dr. Gardella or Dr. McFarland violated Farabee's Fourteenth Amendment rights. Thus, summary judgment in their favor on the remaining claim is proper.[8]

### III. CONCLUSION

For the forgoing reasons, the court will grant defendants' supplemental motion for summary judgment. An appropriate order will be entered.

It is so **ORDERED**.

Entered: August 3, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.08.03 16:29:26
-04'00'

Michael F. Urbanski
Chief United States District Judge

---

[8] In light of the court's ruling, it does not address in any detail the other grounds on which defendants seek summary judgment, but notes that Farabee may not obtain money damages from these state actors in their official capacities under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983," Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989), and the Eleventh Amendment prohibits federal courts from considering claims for damages against defendants in their official capacities. Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996). Because Farabee is no longer housed at WSH or being treated by these medical defendants, his request for any prospective injunctive relief against them is also moot, in addition to being inappropriate because he has not shown a constitutional violation.